OPINION The three issues previously stated are primarily questions of fact which have been resolved in our ultimate findings. Respondent’s case is premised on a net worth plus nondeductible expenditures approach covering the calendar years 1953 through 1960 while petitioner William G. Stratton was Governor of the State of Illinois. The respondent’s computations under this approach which were part of the statement attached to the deficiency notice are set out in our findings. Petitioners challenge the appropriateness of respondent’s use of the net worth method on the ground that they maintained adequate records of all income. Petitioner prides himself on the fact that he was able to and did personally prepare the joint returns from the records that were kept. He reported income from nine sources. In our findings we have set out the amounts of income from each source, deductions and exemptions claimed, and the net or taxable income for each year, the total of which for all years was $171,846.93. The respondent does not contest the correctness of this reporting but contends it does not tell the whole story. By use of the net worth plus nondeductible expenditures approach the respondent determined petitioners’“Corrected net income (1953) or taxable income (1954 through 1960) ” to be a total of $369,096.29, reduced in his brief (pages 58-A and 58-B) to $366,184.92, detailed by years, as follows: [[Image here]] Regarding petitioners’ challenge to the appropriateness of respondent’s approach it is well settled that respondent is justified in using this approach in order at least to test the relative accuracy of the taxpayer’s reporting. Holland v. United States, 348 U.S. 121 (1954); Davis v. Commissioner, 239 F. 2d 187 (C.A. 7, 1956), affirming a Memorandum Opinion of this Court, certiorari denied 353 U.S. 984 (1957); Schwarzkopf v. Commissioner, 246 F. 2d 731, 733 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; Cefalu v. Commissioner, 276 F. 2d 122, 126 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court. Brief excerpts from these cases are in the margin.[4] See also Balter, Tax Fraud and Evasion 10.49 (3d ed). Petitioners not only contend that respondent was not justified in using the net worth approach but question the correctness of practically every item set out in Exhibit A in our findings. We hold respondent was justified in using the net worth approach. Holland v. United States, supra. As to the correctness of the statement itself we have examined all of the evidence in connection with each of the items set ont in the statement and in our ultimate findings have found a revised statement of net worth showing the “Corrected Net Income (1953) or taxable income (1954 through I960)” to be a total of $254,032.51 instead of $171,846.93 as reported or $366,184.92 as now contended for by respondent. Our findings, the amounts reported by petitioners, the percent of our findings so reported, together with the unreported or (overreported) amounts of net or taxable income for each year are as follows: [[Image here]] The so-called “stipulations of facts numbers I, II, and III” mentioned in the first paragraph of our findings are in substance stipulations of evidence rather than facts. As we said in our preliminary statement sufra the stipulations “consisted of substantially all the evidence (some 8,300 pages of testimony and 373 exhibits) that had previously been received in the criminal trial.” See our fn. 3, supra. Petitioners in their brief characterize the evidence of “unreported income” offered in the instant case as “merely a second look at the same evidence” considered by the jury in the criminal trial. In arriving at our revised statement of net worth set out in our ultimate findings we have carefully considered all of the evidence in these stipulations together with all the additional evidence offered and received in the trial before us. In our findings we have set out in a table the amounts of certain assets and liabilities petitioners had on the dates shown in the table. The basis for the facts in this table is our order dated October 2,1967, in connection with the hearing had under Rule 31 (b) (5) of our Rules of Practice. That disposed of a large number of the items in the net worth statement, the correctness of which was questioned by petitioners. One of the most time-consuming considerations dealt with respondent’s request for finding (No. 102) in his brief dealing with “nondeductible expenditures of petitioners paid by checks drawn on the regular account and those not paid by checks” which in turn involved over 1,650 separate expenditures (grouped into 200 separate issues) contained in Exhibits T and U of the “proposed stipulation of facts” attached to the motion to show cause as provided in Rule 81(5) (5) filed April 11, 1967. We think it would be impracticable to discuss each of the 200 separate issues in this opinion. Suffice it to say respondent 'had requested a total “nondeduotible expenditures” for the 8 years of $163,727.91, whereas after using our best judgment we have found the total for the 8 years to be $134,101.10, a reduction of $29,626.81. Our total of $134,101.10 is detailed by years both in our findings and ultimate findings. Another difference between our revised net worth statement and respondent’s determination concerns the amount of “cash” on hand on December 31, 1952, the beginning of the taxable period. Respondent has requested we find that “On December 31, 1952, petitioners had no cash on hand in excess of that determined by respondent” which was $100 in warrants and checks, $1,725.04 in the regular checking account, and $4,633.49 in the savings account. Prior to 1953, petitioner had advanced cash out of his own pocket of between $21,000 and $23,000 for various political expenses. He was entitled to be reimbursed for such advances from future campaign contributions. Of. Rev. Proc. 68-19 (1968-1 C.B. 810, 811). In 1952, there was deposited in the Suburban Trust & Savings Bank political contributions totaling $295,789,09. From all the evidence we have found as a fact that “On December 31, 1952, petitioner had cash on hand not shown in the net worth statement attached to the deficiency notice of at least $15,000.” We hold that this amount should he included in the revised net worth statement as other cash on hand on December 31,1952. Another difference between our revised net worth statement and respondent’s determination concerns the amount of cash “gifts” petitioner received during the taxable years. This is probably the most important factual determination in the case. It not only affects the amount of the net or taxable income for each year as determined by the net worth method but it is a major factor in our consideration of the fraud issue yet to be discussed. Respondent admits that in 1956 petitioner was given a houseboat which cost $4,750, but aside from that he included no other gifts in the net worth statement. Out of almost a million dollars of contributions petitioner contends that he received over $100,000 as outright, unrestricted gifts for his own personal use to do with as he pleased. The line between an outright gift and a campaign contribution is a very thin line. Nevertheless, the IRS in Rev. Proc. 68-19, sufra, recognizes that a political candidate may receive outright gifts excludable from gross income under section 102(a), I.R.C. 1954.[5] Section 5 of Rev. Proc. 68-19 provides: The Service will presume in the absence of evidence to the contrary that contributions to a political candidate are political funds which are not intended for the unrestricted personal use of such recipient. If it can be shown that the funds were intended for the unrestricted personal use of the political candidate, then the Service will apply the principles set forth in Commissioner v. Mose Duberstein, et al., 363 U.S. 278 (1960), Ct. D. 1850, C.B. 1960-2, 428 and Max Kralstein, et ux., 38 T.C. 810 (1962), acquiescence, C.B. 1963-2, 4, to determine whether or not the funds may be excluded from his gross income under section 102 of the Code. Paragraph 9 of stipulation No. Ill provides “if the individuals named below [26 of them] were called to testify in the instant case they would testify as they did in the United States District Court, Chicago, Illinois, in the case of United States v. William G. Stratton, 64 CR 221. Attached hereto and made a part hereof as Petitioners’ Exhibits 1 through 26 are correct copies of the transcript of said testimony.” Several of these witnesses testified unequivocally that they “intended” to make outright gifts to petitioner to do with as he pleased with no strings attached. The respondent has offered no evidence in rebuttal. We have carefully considered all of the testimony of these witnesses, and again using our best judgment have found that during the taxable years petitioner received personal unrestricted cash gifts to do with as he pleased of at least $43,600. On the evidence presented, we find that the transfers total-ling this amount were made from a “detached and disinterested generosity,” “out of affection, respect, admiration, charity or like impulses.” Commissioner v. Duberstein, 363 U.S. 278, 287 (1960). We hold that this total amount of $43,600 Should be included in the revised net worth statement as other nontaxable gifts. The respondent in his determination made no allowance for the itemized or standard deduction. In our revised net worth statement we subtracted a total for the 8 years of $14,953.02 for such deduction. See sec. 21, I.P.C. 1939; sec. 63, I.P.C. 1954. The difference between the “Corrected net income (1953) or taxable income (1954 through I960)” now contended for by respondent of $366,184.92 and our findings of $254,032.51 is $112,152.41. In this opinion we have accounted for $103,179.83 [6] of this difference, leaving three relatively small items totaling $8,972.58 [7] unaccounted for except to the extent of their explanation in our findings. The cost of the 1956 Lincoln and the cost of the framed portrait of Governor Stratton were paid out of campaign funds and were used for campaign purposes and as such are not taxable to the political candidate. We agree with section 2 of Rev. Proc. 68-19, supra, which provides as follows: Political funds are not taxable to tbe political candidate by or for wborn they are collected if they are used for expenses of a political campaign or some similar purpose. However, any amount diverted from tbe channel of campaign activity and used by tbe political candidate for any personal purpose is income taxable to sucb candidate for tbe year in wbicb tbe funds are so diverted. See I.T. 3276, C.B. 1939-1 (Part 1), 108, and Rev. Rul. 54-80, C.B. 1954-1, 11, cited witb approval in William O’Dwyer, et ux. v. Commissioner, 266 F. 2d 575 (4th Cir. 1959), certiorari denied, 361 U.S. 862 (1959), and United States v. Leslie B. Jett, 352 F. 2d 179 (6tb Cir.1965), certiorari denied, 383 U.S.C. 935 (1966). The $570 was depreciation on the 1960 Chevrolet station wagon used in the 1960 campaign, and should be reflected in the net worth statement as a liability.[8] See Balter, supra 10.94-95, and Schmidt, Legal and Accounting Handbook of Federal Tax Fraud 319 (last sentence.) (P-H. 1963). This concludes our determination of petitioners’ net or taxable income for each of the taxable years by means of a revised net worth statement. We repeat here what was said by this Court in Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845: We do not deem it necessary to explain our thought processes or chain of reasoning in mating all our findings. To do so would expand this opinion beyond all reasonable length. Suffice it to say, our findings represent our best judgment, based on the entire record, on all tbe disputed items, and those findings form the basis for our ultimate findings of fact as to the amount of income for each of the years in question. Issue £. — Now that it is settled by John W. Amos, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965); Moore v. United States, 360 F. 2d 353 (C.A. 4, 1966); and Henry M. Rodney, 53 T.C. 287 (1969) ; that a criminal cowoietion for tax evasion works a “collateral estoppel” on the issue of fraud in a subsequent civil suit over a fraud penalty covering the same years, petitioners contend that since petitioner William Gr. Stratton was acquitted on charges brought under section 7201, I.R.C. 1954, in the criminal case (see fn. 3), equity demands that the doctrine of collateral estoppel should apply herein to bar the assertion of penalties under sections 293(b), IJR.C. 1939, and 6653(b), I.K.C. 1954. In their brief petitioners say “If this not be so, then the government is unfairly given the advantage of a ‘one-way street,’ Pierce, J. dissenting in Amos, p. 64.” Unfortunately for petitioners, dissenting opinions are not the law. In his reply brief respondent states that “petitioners did not plead this issue” of collateral estoppel and that “The Court has held on numerous occasions that it will not consider issues which have not been pleaded.” J. William Frentz, 44 T.C. 485, 491 (1965), affd. 375 F. 2d 662 (C.A. 6, 1967). Collateral estoppel is an issue that must be specifically pleaded. Alfred Fortugno, 41 T.C. 316, 323 (1963), affd. 353 F. 2d 429 (C.A. 3, 1965), certiorari granted 384 U.S. 959, but later dismissed under Rule 60, 385 U.S. 954. Among petitioners’ assignments of errors were assignments 4(1) and (m) .[9] We do not think these assignments specifically plead equitable estoppel. In any event, even if the issue were properly 'before us, we do not agree with petitioners that the doctrine of collateral estoppel should be applied in the instant case. In the first place it could not apply to the years 1953 through 1956 as those years were not before the District Court. As to the years 1957 through 1960, which were the years before the District Court, the jury found “William G. Stratton not guilty as charged.” Petitioner Shirley Stratton was not a party to that suit. Also, the degree of the burden of proof is greater in criminal cases than in civil cases. Helvering v. Mitchell, 303 U.S. 391 (1938). In William G. Lias, 24 T.C. 280 (1955), affd. 235 F. 2d 879 (C.A. 4, 1956), certiorari denied 353 U.S. 935 (1957), we said (p. 321): The final contention of the petitioner that the jury found him not guilty of willful attempt to evade income taxes for the years 1942 to 1946, inclusive, which cover a part of the years before us, requires no extended discussion. In Helvering v. Mitchell, 303 U.S. 391, the Supreme Court held that an acquittal of a taxpayer on a charge of willful attempt to evade or defeat income tax was no bar to a collection of the 50 per cent addition to the tax for fraud. In John W. Amos, supra, we said (p. 57) : What respondent does contend here is that under the doctrine of collateral estoppel a taxpayer who has been convicted of willfully attempting to evade his income taxes may not thereafter relitigate in this forum the question whether the tax deficiencies resulting from his previous attempted evasion were “due to fraud.” Clearly, such a contention is not inconsistent with the principle laid down in Helvering v. Mitchell, supra, because the main thrust of that case was simply that an acquittal in a criminal proceeding wherein a greater burden of proof is required does not work an estoppel in a civil case dependent upon the same finding of fact, hut wherein the burden of proof is lesser. * * * And in the recent case of Tsuneo Otsuki, 53 T.C. 96 (1969), we also said (p. 112): However, even if the petitioners were acquitted in a criminal tax evasion ease, it in no way affects their liability for civil fraud in the present case. William (?. Lias ⅜ * * We hold, therefore, that the respondent is not collaterally estopped to contend for the additions to tax here involved. Cf. Robert Neaderland, 52 T.C. 532, 541-542 (1969), on appeal (C.A. 2, Sept. 15, 1969). While respondent may not be collaterally estopped to claim civil fraud it does not follow that he has sustained his burden of proof as to fraud. The determination of fraud is an issue of fact. Welburn Mayock, 32 T.C. 966, 974 (1959); Lessmann v. Commissioner, 327 F. 2d 990, 993 (C.A. 8, 1964), affirming a Memorandum Opinion of this Court; Estate of William Kahr, 48 T.C. 929, 935 (1967); Tsuneo OtsuM, supra. The burden of proof in respect of such issue is upon the respondent. Sec. 7454(a), I.R.C. 1954. His evidence of proof must be clear and convincing. Arlette Coat Co., 14 T.C. 751 (1950); W. A. Shaw, 27 T.C. 561 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958) ; Cefalu v. Commissioner, supra; Tsuneo Otsuki, supra. An intent or purpose to evade tax is essential. James Nicholson, 32 B.T.A. 977, 989 (1935), affd. 90 F. 2d 978 (C.A. 8, 1937); Estate of Louis L. Briden, 11 T.C. 1095, 1133 (1948), affirmed sub nom. Kirk v. Commissioner, 179 F. 2d 619 (C.A. 1, 1950). In Tsuneo Otsuki, supra, we said (p. 106) : We have held that a mere understatement of income does not establish fraud. James Nicholson * * ⅜. The existence of fraud with intent to evade tax must be affirmatively established. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. In the often-cited case of Mitchell v. Commissioner, 118 F. 2d 308 (C.A. 5, 1941), the circuit court said: “The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing.” And in WeTburn Mayoeh, supra, we added: “The question of intention is a factual one to be resolved from a consideration of the entire record. M. Rea Gano, 19 B.T.A. 518; E. S. Iley, supra." We have carefully examined the entire record in this case and have found no evidence that either of the petitioners had any intention of evading a tax believed to be owing. Petitioner personally prepared the joint returns from records that were meticulously kept. Respondent Ras failed to point out one false item reported on these returns. Ee-spondent’s position simply is that petitioners kept accurate records of those items that could be checked by a revenue agent but failed to keep adequate records of a large amount of currency that must have been received by petitioner from some allegedly unknown source while he was Governor and which was used by petitioners for their personal purposes and that this is demonstrated by respondent’s net worth statement which originally showed an alleged unreported income for the 8 years of $197,249.36, reduced in his brief to $194,337.99, and redetermined by this Court to be $82,185.58. We are satisfied from the evidence that this allegedly unknown source of currency came from close friends of petitioner either as campaign contributions or as outright gifts. We discussed this phase of the case at some length under the first issue and need not repeat that discussion here other than to say that these gifts and other alleged gifts considered by us not to be outright “gifts” but rather falling in tiie class of “campaign contributions” or political funds, no doubt account for the greater part of the alleged unreported income determined by the respondent. In our opinion under the first issue we said “The line between an outright gift and a campaign contribution is a very thin line.” If a contribution is an outright gift, it is excludable from gross income under section 102(a), supra. If it falls within the class of political funds it is taxable to the political candidate only to the extent that it is “diverted from the channel of campaign activity and used by the political candidate for any personal purpose” as stated in section 2 of Rev. Proc. 68-19, supra, with which we agree. I.T. 3276 cited in section 2, sufra, published in 1939, as far as material here, merely “held that a political gift received by an individual or by a political organization is not taxable to the recipient.” “This Euling continued in effect until 1954, when it was purportedly ‘modified’ by Rev. Rul. 54-80 * * O'Dwyer v. Commissioner, 266 F. 2d 575, 585-586 (C.A. 4, 1959), affirming 28 T.C. 698 (1957), certiorari denied 361 U.S. 862 (1959). Rev. Rul. 54-80 provides in part: Where a political gift is received by an individual or a political organization and it is held or used for the purposes intended, i.e., for present or future expenses of a political campaign or for some similar purpose, it is not taxable income to the recipient, See I.T. 3276, supra. However, any amount diverted from the channel of campaign activities and used by a candidate or other individual for personal use constitutes taxable income to such candidate or other individual for the year in which the funds are so diverted. * * * I.T. 3276, supra, is modified to the extent that it is inconsistent with the views expressed herein. Petitioners vigorously contend that Rev. Rul. 54-80, supra, is not the law. They also contend that it is in conflict with Eev. Eul. 59-57 (1959-1 C.B. 626) which states in part that “Any individual who makes a contribution or gift in excess of $3,000 in any one calendar year to a political party or to a candidate for public office must file a Federal Gift Tax Return, Form 709.” In their brief they argue: Of the many political experts called by petitioners, none indicated that he recognized Revenue Ruling 54-80 as expressing the law of the land. Timothy Sheehan, formerly a Congressman and member of the Tax Writing Ways and Means Committee, specifically stated that it was not the law and that Congress had never intended such a law. Senator Dirksen expressed a similar opinion. None of the many political experts called by petitioners expressed any contrary opinion. All felt that a political contribution received by an individual candidate was his to do with as he desired without tamable consequences. No contrary political experts or opinions were adduced by respondent. [Emphasis supplied.] Petitioners’ contention, that Rev. Rul. 54-80, supra, is not the law is without merit. The two cases of O'Dwyer v. Commissioner, supra, and United States v. Jett, 352 F. 2d 179 (1965), certiorari denied 383 U.S. 935, definitely hold to the contrary. The Court in the O'Dwyer case said in part: We reach the conclusion that Rev. Rul. 54^80 was declaratory of judicial interpretation of existing law and that it supplemented and amplified I.T. 3276, supra, notwithstanding the use of the word “modified”. The two rulings are not necessarily inconsistent. I.T. 3276 did not purport to state the result if the recipient of a political contribution diverted it to his personal use; that sequel was supplied by Rev. Rul. 54r-80. * * * To the same effect see United States v. Jett, supra at 182. It thus becomes unnecessary to decide whether Rev. Rul. 54-80 is in conflict with Rev. Rul. 59-57, supra. Respondent relies solely upon his net worth statement to establish fraud. He contends that “the consistent understatement of substantial amounts of income over a number of years standing alone, is effective evidence of fraudulent intent.” This is not always true, especially where the understatement of substantial amounts is due to a mistake of law. In Spies v. United States, 317 U.S. 492 (1943), the Supreme Court said “It is not the purpose of the law to penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care.” In Welburn Mayock, supra, we concluded thus: We have found as a fact that petitioner did not file a false or fraudulent income tax return with intent to evade tax for the year 1948. We think the evidence presented herein permits of no other conclusion. Although petitioner may have been mistaken as to the legal consequences of the transactions we are satisfied he had no intention of evading a tax believed to be owing. A mistake of law, if it was a mistake, is not equivalent to the fraud with intent to evade tarn named in the statute. * * * [Emphasis supplied.] And in Toledano v. Commissioner, 362 F. 2d 243 (C.A. 5, 1966), affirming in part, reversing in part, and remanding a Memorandum Opinion of this Court, the Court of Appeals for the Fifth Circuit said in part: The understatements of interest and dividend income were substantial and consistent. Being substantial and consistent these are evidence of fraud, but such evidence, without more, is not enough to carry the Commissioner’s burden to establish fraud by clear and convincing evidence. Merritt v. Commissioner, 5th Cir. 1962, 301 F. 2d 484. * * * Toledano’s conduct, in a number of ways, points to an absence of tax fraud. He waived limitations and cooperated with investigating agents. [Emphasis supplied.] In the Merritt case the Fifth. Circuit concluded that there were facts present other than the mere failure to return income. In Merritt for 7 years the understatement was about $80,000 compared with $103,000 of reported income, or about 44 percent unreported. In the instant case, we have determined the understatement for 8 years to be $82,185.58 compared with $171,846.93 of reported income, or about 33 percent unreported. Petitioner fully cooperated with the investigating agents in every way. He turned over to them all of his records, including approximately 2,000 canceled checks. Pie appeared at the office of the intelligence division of the Internal Revenue Service on three different occasions in 1961 and 1962, where approximately 577 questions and answers were recorded on 96 single-spaced typewritten pages. We are satisfied that petitioner tried to answer all of the questions put to him in a frank, unreserved, respectful, truthful, sincere, and cooperative manner. On August 30,1962, petitioner again appeared at the office of the intelligence division for a final conference which lasted only 27 minutes. He was told that the current investigation was nearing completion ; that “consideration is being given to a possible recommendation that criminal proceedings be instituted against you for attempted evason of your income taxes”; and that “this interview is to enable you to produce any information, facts, or evidence which you desire to have considered in connection with this matter.” Petitioner replied, in part, as follows: My statement would begin by saying that so far as I know a record has been kept of everything that the law required in the way of income. All of my salary, business income, and things of that nature, have been meticulously accounted for and, to my knowledge, anything the law required in the way of reporting was done. I certainly respect the Department’s views, and yet I think there are -two sides, of course, to this question. During this investigation I have made available all of the information I had to expedite the search for information on the part of the Department. My family has done the same thing, of course, at my instruction. I think the problem involved here is a question of opinion more than any particular fact being involved. It was my understanding that under the law I was required to report all personal taxable income. I think the investigation has shown that has been done, that I have no hidden businesses or front businesses set up to give me an advantage of getting profit from the State or something of that kind. In other words, all of my business interests have been fully shown and reported. [[Image here]] It is my understanding tliat gifts are not reportable and not taxable. It is also true, of course, that political contributions are not reportable for State officers. I had several funds set up to handle my personal business. I think all of those have been checked out; I’m sure they have been. ⅜: ⅜ * I made these returns in good faith. It is not easy when you are as busy as the Governor of a big state is, to do that — to make his own returns. But I thought they met all of the necessary qualifications. * ⅜ * * * * * I think the investigation shows I had no under-the-table business or dealings that were illegal or was given funds that weren’t in the public interest or that were improper. I’m very proud of that record. I think it boils down to a question of the use of funds that I did not consider taxable. I certainly made no attempt to conceal or evade in any of these operations, and, as I say, I think the whole problem resolves there to that point. I don’t know of any particular questions I haven’t answered. I don’t personally know of any evidence of any taxable income that I haven’t reported, but- — that’s my feeling on the matter from our side of it. We need not belabor this issue much longer. As we see this case we think the unreported income disclosed by the net worth computation came from the “personal” use by petitioner of “political funds” which he reasonably believed were “unrestricted gifts” to him to do with as he pleased, but being political contributions rather than outright gifts, and having been diverted from the channel of campaign activity and used by petitioner for “personal” purposes, became taxable income to him under the O'Dwyer and Jett decisions. A good example of one of the “political contributions” is the testimony of Ward Just (one of the 26 witnesses for petitioners). Just testified that he was a newspaper publisher in Illinois for about 40 years; that he had known petitioner for most of his 51 years; that Just’s father and petitioner’s father and their families were friends; that he supported petitioner editorially ; that a “group of Lake County citizens have supported him financially from time to time”; that the first time he made a financial contribution to petitioner was in the spring of 1956 when “I personally gave him” a thousand or twelve hundred dollars; that when asked “when you turned over these funds, this currency, to the Governor, do you recall whether or not you placed any restrictions on their expenditure?” Just answered “None whatsoever.” Just also testified that during the period 1956 through 1960 he transferred to petitioner approximately an additional $18,000 also with no restrictions attached. While we have not included Just’s contributions as outright gifts, we can well see where petitioner might reasonably believe that such, and similar political contributions from close friends were gifts and not income when used for personal purposes to increase his net worth. Petitioner was, of course, mistaken as to the law, but as we said in the Mayoeh case “A mistake of law, if it was a mistake, is not equivalent to the fraud with intent to evade tax named in the statute.” We hold that the respondent has not established fraud on the part of the petitioners by the clear and convincing evidence which was his bnrden. Issue 3. — Since we have found no fraud, it follows that the statute of limitations is a bar to the assessment and collection of any deficiencies for the years 1953 through 1957. Sec. 375, I.R.C. 1939, as to 1953; and sec. 6501(a), I.R.C. 1954, as to 1954 through 1957. As to the years 1958 through 1960, the respondent has affirmatively alleged (see fn. 2) that he is entitled to the 6-year period provided for in section 6501(e)(1) (A).[10] Petitioners’ returns for the years 1958, 1959, and 1960 were filed on or after April 15,1959. The notice of deficiency was mailed to petitioners on April 13,1985. Consequently, if gross income properly includable in each return was omitted in excess of 25 percent of the amount of gross income stated in the return, then the period of limitations with respect to assessment and collection of the tax has not expired. The burden of proof as to this issue is upon the respondent. C. A. Reis, 1 T.C. 9 (1942), affd. 142 F. 2d 900 (C.A. 6, 1944); H. A. Hurley, 22 T.C. 1256, 1264 (1954), affirmed on another point 233 F. 2d 177 (C.A. 6, 1956); Devid Courtney, 28 T.C. 658, 668 (1957); Gaylord C. Peters, 51 T.C. 226, 230 (1968); Philipp Bros. Chemicals, Inc. (Md.), 52 T.C. 240, 254 (1969), on appeal (C.A. 2). Such omission of 25 percent must result from omitted gross income rather than from excessive deductions. H. A. Hurley, supra; David Courtney, supra. Twenty-five percent of the amount of “gross income” stated in the returns for 1958, 1959, and 1960, was $9,980.83, $9,399.04, and $9,883.03, respectively. Eespondent contends that he has established that petitioners’ unreported “taxable income” for the years 1958, 1959, and 1960, was $36,628.94, $13,127.29, and $13,555.87, respectively. In our revised net worth statement we have found that petitioners’ unreported or (over-reported) “taxable income” for the same years was $28,457.96, $4,414.16, and ($1,874.83), respectively. It is obvious that petitioners did not omit more than 25 percent of the gross income stated in their returns for the years 1959 and 1960, and that the statute of limitations bars the assessment and collection of deficiencies, if any, for those years. The evidence shows that the “unreported” income disclosed by the net worth computation resulted from petitioner’s use of “political funds” for “personal purposes.” Petitioners should have reported such funds which were used for personal purposes as a part of their gross income. Sec. 61, I.R..C. 1954. It follows that for 1958, petitioners omitted more than 25 percent of the gross income stated in their 1958 return, and that the 6-year statute of limitations is, therefore, applicable for that year. We so hold. Decision will be entered under Bule 50. “[From Holland ] To protect the revenue from those who do not ‘render true accounts,’ the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer’s books accurately reflects his financial history. “[From Davis] Taxpayer obviously overlooks the fact that the net worth technique of computing income is not a method of accounting. It is no more than proof of income by circumstantial or indirect evidence. If a taxpayer’s net worth has increased over a period of time and the increase is not due to nontaxable receipts or nontaxable appreciation of assets, the conclusion is inescapable that taxable income has been received. The fact that the taxpayer’s books and other records are consistent with his income tax returns or are internally consistent proves nothing more than that they are consistent; it does not establish that they are truthful or accurate. * * * In short, the apparent adequacy of the taxpayer’s books is the very thing that the net worth method attacks by independently demonstrating the receipt of unrecorded and unreported taxable income. The Holland decision makes it clear that there are no conditions precedent to the utilization of the net worth technique. [Emphasis added.] “[After quoting the above quoted excerpt from Holland, the Court in Schwarzkopf continued.] This quoted portion of the Holland case is recognized by petitioner as sanctioning the use of the net worth method to test the accuracy and completeness of the books of account. Thus, the net worth method serves two purposes: first, it may be used to test the correctness of the books ; secondly, it is cogent evidence of the amount of income which went unreportedi. The fact that the books on their face appear to be adequate does not preclude the use of the net worth method. “[From Cefalu] The net worth method may be stated as a mathematical formula: increase in net worth, plus nondeductible disbursements, minus nontaxable receipts, equals taxable net income.4 The net worth of the taxpayer must be arrived at carefully but not necessarily with mathematical certainty. * * * The primary essential is the establishment of am opening net worth. [Footnote omitted.]” SEC. 102. GIFTS AND INHERITANCES. (a) General Rule. — Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance. See the following: Nondeductible expenditures_$29, 626. 81 Cash on hand on Dee. 31, 1952_ 15,000.00 Other nontaxable gifts_ 43, 600. 00 Itemized or standard deduction_ 14, 953. 02 Total_ 103,179. 83 See the following: Cost of 1956 Lincoln_$4, 677. 75 Depreciation on cost of 1960 Chevrolet station wagon used in campaign_ 570. 00 Cost of framed portrait used in campaign_ 3, 724. 83 Total_ 8, 972. 58 In our revised net worth statement we listed the “depreciated” cost of the Chevrolet as an asset at $2,000 (cost of $2,570 less allowable depreciation of $570). “(1) The Commissioner erred in his determination that there was a deficiency due to fraud on the petitioners’ 1953 income tax return and in his determination that there was an underpayment of tax due to fraud on the petitioners’ income tax returns for the years 1954,1955,1956,1957,1958,1959 and 1960. “(m) The Commissioner has erroneously proposed the assessment of penalties under Section 293(b) of the 1939 Internal Revenue Code and Section 6653(b) of the 1954 Internal Revenue Code in the following amounts for the following years : * * *” “ SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (e) Substantial Omission of Items. — Except as otherwise provided in subsection (c)— (1) Income taxes. — In the case of any tax imposed by subtitle A— (A) General rule. — If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *